# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2787

_____

Darin Winters, as Personal    *
Administrator of the Estate of   *
Donald Winters,    *
   *
   *   Appeal from the United States
     Appellant,   *   District Court for the
   *   Eastern District of Arkansas.
     v.   *
   *
Arkansas Department of Health and   *
Human Services; Keith Ferguson,   *
Sheriff, in his official capacity as   *
Sheriff of Benton County,   *
Arkansas; John Selig, Chief   *
Executive Officer of DHS,   *
   *
     Appellees.   *

_____

Submitted: March 14, 2007
    Filed: June 29, 2007 (Corrected 7/9/07)

_____

Before COLLOTON, HANSEN, and GRUENDER, Circuit Judges.

_____

HANSEN, Circuit Judge.

Mr. Darin Winters, as personal administrator of the estate of his father, the late Mr. Donald Winters (whom we will refer to as "Mr. Winters"), brought suit alleging claims pursuant to 42 U.S.C. § 1983; Title II of the Americans With Disabilities Act

of 1990 (ADA), 42 U.S.C. § 12132; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, after his father died while a pretrial detainee in the county jail on a state law charge of criminal trespass. The defendants remaining in the lawsuit are the Arkansas Department of Health and Human Services (DHS), its chief executive officer, and the Benton County Sheriff in his official capacity. Following a bench trial, the district court[1] entered a judgment for the defendants, accompanied by a lengthy and thoughtful discussion of the facts, as well as a careful consideration of the applicable law. See Winters v. Ark. Dep't of Health and Human Servs., 437 F. Supp. 2d 851 (E.D. Ark. 2006). Darin Winters appeals.

"[W]e review the district court's factual findings for clear error and its conclusions of law *de novo*." Gibson v. Caruthersville Sch. Dist. No. 8, 336 F.3d 768, 772 (8th Cir. 2003). The district court's opinion provides a detailed discussion of all the facts of this case, see Winters, 437 F. Supp. 2d at 855-88, which we will only summarize. Mr. Winters was an acutely mentally ill person who died in a county jail on January 1, 2003, while being held on a charge of criminal trespass. The district court found that the cause of his death was a previously undiagnosed physical ailment of "peritonitis due to a perforated ulcer that more likely than not perforated sometime after his arrest on December 28, 2002." Id. at 876. The district court also found that Mr. Winters' mental illness may have played a role in his death by rendering meaningful communication with the medical professionals who treated him almost impossible. Absent accurate information from the patient, the medical personnel were denied information that might have aided in their ability to timely diagnose the perforated ulcer.

Mr. Winters also had "multiple blunt force injuries of head, trunk and extremities including fractured ribs." Id. at 875. Mr. Winters himself caused the

---

[1]The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

contusions, abrasions, and fractured ribs by striking his own head, torso, and extremities against the holding cell's toilet and by resisting and struggling against restraints. The evidence supports the district court's finding that these injuries were not the cause of his death. The district court concluded that the Sheriff and his deputies "did everything within reason to protect Mr. Donald Winters from injuring himself." Id. at 876.

On the evening of December 28, 2002, police officers were called because Mr. Winters, who had a history of two prior psychotic episodes requiring hospitalization and treatment, was persistently banging on a neighbor's door and would not leave. The officers, aware of Mr. Winters' mentally ill condition, were unable to establish a meaningful dialogue with him. They advised him to go home or he would be arrested for criminal trespass, but Mr. Winters did not respond to the officers, except to tell them that they were going to be executed. It was apparent that he was mentally ill and would not go home.

The officers arrested Mr. Winters on a charge of criminal trespass and transported him immediately to the Bates Medical Center to have him examined and admitted into the psychiatric ward. He had to be restrained during the examination and did not communicate meaningfully concerning his health. The examining physician would not admit him into Bates, even though Mr. Winters was considered a danger to himself and others, because the psychiatric ward at Bates was not equipped to handle violent and aggressive patients. The physician at Bates discharged Mr. Winters to the custody of the police, and he was taken to the jail.

After Mr. Winters injured himself by beating his head, chin, and elbows against the toilet, officers placed Mr. Winters in a detoxification cell from which they could monitor his actions by video. He appeared before a magistrate judge on the evening of Sunday, December 29, 2002. The magistrate judge found that probable cause

supported the criminal trespass charge, set bail at $500, and ordered Mr. Winters to appear in the Benton County District Court on January 5, 2003.

The next morning, Monday, December 30, 2002, Mr. Winters began standing on a bench in the detox cell and exposing himself in front of the window. He was also masturbating and smearing feces around the cell. He managed to take off a suicide smock and continued exposing himself. Mr. Winters refused to eat or drink water, accusing the officers of giving him acid. His son Darin visited him and convinced him to drink three or four cups of water, but after drinking it, Mr. Winters held his right side and complained that it was acid. The officers advised Darin that he could take his father out of the jail if he would assume responsibility for him, but Darin indicated that he was unable to handle his father in this condition. He signed a petition for the involuntary commitment of Mr. Winters that day.

On Tuesday, December 31, 2002, following an involuntary civil commitment hearing, the presiding judge committed Mr. Winters to the Arkansas State Mental Health System. Because no regional inpatient facility could accommodate an acutely mentally ill patient, the court specified that Mr. Winters would be sent to the Arkansas State Hospital in Little Rock for seven days of evaluation and assessment to determine whether treatment for mental illness would be appropriate. The officers then transported Mr. Winters directly to the Ozark Guidance Center, which was the designated local receiving facility. Ozark staff determined that no beds were currently available at the State Hospital in Little Rock, or at any other state facility that accepts mental health commitments, and accordingly, they placed Mr. Winters' name on a waiting list for admittance to the State Hospital. A physician at Ozark administered two injections to calm Mr. Winters, and after an examination, returned him to the custody of the officers, noting that Mr. Winters appeared to be severely dehydrated. Mr. Winters fell asleep on his return to the county jail to await placement in the State Hospital.

As soon as the jail's physician learned of the possible dehydration, officers transported Mr. Winters back to the emergency room at Bates Medical Center. The examining physician found Mr. Winters to be mildly dehydrated and administered two liters of fluids. The physician found no significant dehydration and no indication of any serious medical problem. He was aware that the staff at Ozark had already evaluated Mr. Winters, and Bates was not equipped or staffed to deal with acutely psychotic patients. Accordingly, when the physician concluded that Mr. Winters was in a stable physical condition, he released him to the custody of the Sheriff.

Early the next morning, on January 1, 2003, Mr. Winters refused to take the medicine that had been prescribed for him at Ozark. He appeared to be sleeping on a mat in the middle of the cell, fully clothed, from 8 to 10 a.m. Around 2:30 p.m., he was observed naked in the cell and on his knees leaning over. He was sitting up around 3:30 p.m. but was discovered on his side and with no pulse around 4:20 p.m. Attempts to revive him were unsuccessful.

Experts testified about the need for more psychiatric beds in inpatient facilities. A private inpatient facility known as Highland Hall had previously accepted patients who came to Ozark Guidance Center needing psychiatric services, but its doors closed in April 2002 due to financial considerations. After this facility closed, there were inadequate local facilities to attend to the needs of acutely mentally ill patients, and the State Hospital became overburdened as regional facilities closed. Expert testimony indicated that absent an appropriate inpatient facility capable of taking on the patients from this region, Ozark had no choice but to return patients to jail if the State Hospital had no open beds. Several task force reports indicated that the state government was aware of the problems created by the shortage of beds for mentally ill citizens. The state legislature appropriated funds for some 16 additional beds after Mr. Winters' death, but experts opined that this remained inadequate to meet existing needs.

The district court ruled in favor of the defendants, finding no official capacity liability on the part of the Sheriff or the director of the DHS because their actions were not the proximate cause of Mr. Winters' death, and there was no policy or custom to deprive acutely mentally ill citizens of placement in inpatient mental health treatment facilities. See Grayson v. Ross, 454 F.3d 802, 810-11 (8th Cir. 2006) (stating the standard for official-capacity liability under § 1983). The district court found that the Sheriff's officers had done everything they could to protect Mr. Winters from injuring himself and that they were not deliberately indifferent to his serious medical needs. Neither the Sheriff nor the doctors who had examined Mr. Winters had suspected that a delay in admitting him to the State Hospital would adversely affect either his physical or mental health.

The district court also found no liability under the ADA or the Rehabilitation Act for failure to provide mental health services. While the failure to provide reasonable medical care to a pretrial detainee on the basis of a disability could be considered discrimination, the district court found that there was no evidence that Mr. Winters had been denied medical care. The Sheriff's Office had attempted to obtain care and proper placement for Mr. Winters on three occasions. The district court rejected as inapplicable the plaintiff's argument based on Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999) (plurality), that Mr. Winters did not receive an appropriate placement under the ADA because jail is not the least restrictive placement for a person with a mental illness. The Olmstead case dealt with discrimination arising from isolating persons with mental illness in an institution when the state's own treatment professionals have determined that a community setting would be appropriate. See 527 U.S. at 602. The district court properly distinguished the situation at hand, noting that Mr. Winters was awaiting transfer to the State Hospital for a decision about his appropriate placement, and the staff at Ozark had returned him to the custody of the Sheriff until there was an open bed at the State Hospital because no other treatment facility could take him. (He was still under an order requiring him to post bail on the trespass charge.) No treatment professionals

had yet had the opportunity to evaluate him or recommend a placement for him and consequently, the least restrictive placement standard did not come into play. See Winters, 437 F. Supp. 2d at 892-96.

On appeal, Darin Winters asserts that his father did not receive a proper placement under the ADA because incarceration is not the least restrictive environment for a mentally ill patient and that the actions and omissions of the appellees amounted to deliberate indifference under § 1983. At oral argument, Darin Winters' counsel clarified that he is not appealing the district court's decision that Mr. Winter's death was not caused by deliberate indifference. Instead, he asserts that the officials were deliberately indifferent and discriminated against Mr. Winters while he was incarcerated prior to his death.

No party to this suit suggests that jail is an appropriate treatment facility for a mentally ill person. The district court agreed that county "jails should not become our mental hospitals by default," but aptly recognized that the solution to the problem of an inadequate number of available mental health treatment facilities requires decisions of how to best allocate available resources, and those decisions belong to the legislative branch. Id. at 904. In this case, although Mr. Winters was arrested on a criminal charge, the Sheriff's Office immediately sought treatment for him and attempted to transport him to an appropriate facility on several occasions. Mr. Winters was not denied admittance to the State Hospital on the basis of his disability, but for a lack of available space. While a policy of same-day or immediate admission into an appropriate mental health facility may be desirable in the best of all worlds, it is not mandated by the ADA, the Rehabilitation Act, or the Constitution, and it may not always be feasible given a state's limited resources. We agree with the district court's conclusion that Mr. Winters was not discriminated against on the basis of his disability.

Additionally, the district court correctly concluded that there was no deliberate indifference to Mr. Winters' serious medical needs, and neither was there a policy or custom to deprive mentally ill citizens of treatment. The Sheriff's officers attempted to get Mr. Winters into a treatment facility and took measures to protect him from personal injury when he began harming himself. We agree with the district court's conclusion "that the Sheriff had no option but to maintain custody of Donald Winters in order to protect him and others because neither Ozark Guidance Center, Bates Hospital, Darin Winters or the [Arkansas State Hospital] would accept custody of him." Id. at 897.

Having carefully reviewed the record, we conclude that the district court's findings of fact are not clearly erroneous and that the district court's analysis is correct, thorough, and well-reasoned. Accordingly, we affirm the judgment of the district court. See 8th Cir. R. 47B.

_____